Filed 5/20/25  P. v. Baines CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIO MAURICE BAINES,<br><br>    Defendant and Appellant. | A167239<br><br>(Contra Costa County<br>Super. Ct. No. 05001920503) |

Defendant Mario Maurice Baines appeals from a judgment issued after a bench trial adjudging him to have committed sexual assault and domestic battery of a former girlfriend, Jane Doe, for which he was sentenced to eight years four months in state prison.

Baines argues the trial court violated his due process rights by considering portions of a recording of a police officer's interview of Jane Doe the day after the incident (body cam video) that the court never admitted into evidence, and also abused its discretion because, contrary to the court's ruling, Jane Doe's recorded statements in the interview were inadmissible hearsay and not subject to the exception for prior consistent statements provided for in Evidence Code section 791.

Agreeing with the People, we conclude that Baines has forfeited his due process argument by failing to raise it below, and we reject his alternative

1

ineffective assistance of counsel argument. We also reject Baines's claim of error in the admission of the body cam video. Because the defense attacked Jane Doe's credibility on the ground, among others, that she changed her testimony between what she said in that interview and her testimony at the preliminary hearing and trial, the video was properly admitted under the prior consistent statement exception to the hearsay rule. The attack on Jane Doe's credibility for changing her testimony was a charge of recent fabrication, which triggered this exception.

We will therefore affirm.

## I. BACKGROUND

The Contra Costa District Attorney's Office charged Baines by felony complaint and then proceeded to trial under an information, dropping one of the original counts but otherwise realleging original allegations on charges of (1) assault with the intent to commit a felony, that being rape, sodomy, or oral copulation (Pen. Code,[1] § 220, subd. (a)(1)), and (2) injuring a spouse, cohabitant, fiancé, person with whom the defendant was in a dating relationship, or parent (§ 273.5, subd. (a)). Various enhancements and special allegations accompanied these charges.

Appellant waived jury trial and the case was tried to the court in December 2022. It was undisputed at trial that, when the events on which the charges are based on in this case occurred, Baines and Jane Doe were in a dating relationship. All of the charges involved Baines's actions towards Jane Doe in August 2019 at her older cousin's apartment, where Jane Doe was temporarily staying with her cousin and the cousin's apartment mate. The evidence presented included the testimony of various witnesses, as well as the body cam video and a related transcript.

---

[1] Undesignated statutory references are to the Penal Code.

2

## A. *The Body Cam Video*

The Walnut Creek police officer who interviewed Jane Doe at the hospital and recorded the interview on the body cam video testified that Jane Doe was "relatively calm and cooperative, amenable," during the interview. He also spoke that night with Jane Doe's cousin and her boyfriend, who were witnesses to the aftermath of the incident at the apartment.

The court admitted the body cam video into evidence, as well as a transcript of the video that turned out to contain only a portion of what was on the video, as prior consistent statements over the defense's hearsay objection.

In the body cam video, Jane Doe, sitting with her left arm in a sling and talking in even tones, answers the police officer's questions. She states that the previous evening she was having drinks with her boyfriend (who, she said, was 27 years old and named "Maurice Jordan," but who was later identified as Baines) and friends by a pool. She had four or five shots in an hour and Baines had one drink. They then returned to her cousin's apartment, where she was staying.

At the apartment, Baines, with Jane Doe sitting on a couch with him, tried "to get [her] to perform oral sex," which she refused to do. He grabbed her hair and pulled her head down. She stood up and started arguing with him over his insistence. She slapped him and he said, " 'What? You—you'd slap me?' " After she responded that she had slapped him to let him know "this is not happening," and that he was trying to "verbally force" her to do something, he stood up and punched her one time, on the left side of her head, which she tells the officer, was swollen as a result.

The two tussled. Jane Doe defended herself, blocking, hitting Baines back, and trying to push him and walk away. Baines pulled her back, which, she says, was "how my wrist could have gotten broken," because he tried to

3

restrain her "a lot through the tussle," including by prying both her hands behind her back, and she kept trying to pull away from him. She screamed at him to leave and told him that her wrist was hurting, to which he responded that she was drunk. He said, " 'I'm not leaving until we fuck. Like, I'm not gonna leave because I'm—I'm trying to fuck you."

Jane Doe also tells the officer that Baines had previously slapped her face at a bar trying to talk her into "something crazy." She at first denies that he had ever tried to strangle her, but then remembers that once, as she sat in the driver's seat of her parked car, they argued and Baines, from the back seat, grabbed her neck with both hands and squeezed, the pressure he applied being about a four out of 10.

The transcript of the interview ends around here. In the untranscribed portion of the interview, the officer, among other things, tells Jane Doe about STAND, a domestic violence resources provider that was available to her, and urges her to call the service provider from the hospital to see if they can be of help to her that night. She tries to call them but errs in her use of the phone, then indicates she would rather call them later. The officer then coaxes her into talking to them, calling the service provider for her and giving her the phone; she talks briefly to the provider, the officer then talks to the provider to provide information about Baines, and Jane Doe then arranges for the provider to call her later.

## B. *Jane Doe's Trial Testimony*

Three years after the body cam video was recorded, Jane Doe testified at trial that in August 2019, when she was about 26 years old, she was staying at her cousin's two-bedroom apartment, sleeping on the living room couch. She had been dating Baines, whom she knew by a different name, for several months. Baines visited her the day of the incident. That night, she

4

said, "He put his hands on me to the point I was injured and in an arm cast," "punched me, repeatedly," and "squeezed my body and held down my arms."

When Baines came over, Jane Doe testified, she arranged to socialize at the apartment complex's pool with another couple because she did not want to be alone with him, having begun to think their relationship was not working. At the pool, she drank at least four of five shots of rum in about an hour. Baines drank too, but she could not remember how much.

The two returned to the apartment around 12:30 a.m., where she put on a movie and sat on the couch with Baines. At some point, "[h]e attempted to go into a sexual act" with her. He first signaled for her to rub his pants by putting her hand in his lap, and she resisted. She next recalled his penis being "out over his pants," him "pushing" her head "down into his penis," and her face making contact with his penis. She thought he wanted her to "suck his dick" and she did not want to do that. She was scared and tried to lift her head up but he prevented her from doing so until she was finally able to stand up.

Baines was mad. Jane Doe asked him what he was doing, told him to "chill out," and pointed to the two apartment bedrooms where her cousin and the apartment mate were with their boyfriends, meaning that it "was too much." Jane Doe testified Baines said "to go and brush my teeth and to come back so I can, so I can suck his dick, but that wasn't going to happen." She responded by slapping him on the side of his face.

Baines, Jane Doe said, then "stood up and stepped towards me, not saying anything, and just punched me." He hit her near her eyes and cheekbone on the left side of her face and her face was "really swollen" afterwards. She punched him back and he started punching her more. She could not recall where he punched her but said, "I just remember it was a lot,

because I had to fight him off of me for probably more than 5 minutes, almost 10 minutes, probably." She was able to block some of the punches. She cried and told him to leave, but he tried to hold her down, "keeping my arms down, like close to my body, and even like—like, squishing me." She could not talk during their fight because she was trying to catch her breath.

Finally, Baines let Jane Doe go. She told him again to leave but he refused. She felt a shooting pain in her left arm at her wrist. She went to her cousin's bedroom and told her cousin about her arm and to get Baines "the fuck out, tell him to leave." She stayed there until an Uber ride was ordered for Baines and he left. Eventually, she went to sleep.

When Jane Doe woke up later that morning, her left arm felt even worse and she could not move it. She had her cousin take her to the hospital. There, X-rays were taken and a social worker told her she should talk to the police, which she was willing to do after seeing X-rays indicating she was badly injured.

Eventually, Jane Doe's arm was put in a full cast, which she wore for about a year and a half. At the time of trial, her left arm was still swollen and curved, it hurt, and she did not have full use of her arm or left hand, impeding her ability to perform ordinary tasks.

Jane Doe further testified that one time before the incident, Baines grabbed and squeezed her neck as they sat in a parked car. He put his hands around her neck and squeezed for a short time, during which she was not able to breathe. Her recollection was not clear, but she believed she was sitting in the driver's seat and that Baines sat in the passenger seat.

On cross-examination, Baines's trial counsel, among other things, repeatedly explored inconsistencies between some of Jane Doe's past

statements—including statements on the body cam video—and her trial testimony in an obvious effort to undermine her overall credibility.

## C. *S.G.'s Trial Testimony*

Jane Doe's cousin, S.G., testified she was five or six years older than Jane Doe and knew Jane Doe her entire life. On the night of the incident, Baines, whom S.G. also knew by a different name, was at the apartment. S.G. woke up to Jane Doe yelling with "urgency" in her voice, wanting to use S.G.'s phone, and saying something like "you can't treat people like this, you can't just do this and get away with it, this isn't right, or something." Jane Doe tried to call the police but could not because of the poor phone reception in the apartment. She banged the phone on a table, causing S.G. to take it from her. Jane Doe was crying, "hysterical," and holding her arm, which had a "bump" or "knot" in it. S.G. talked with Jane Doe while her boyfriend talked with Baines.

Baines seemed "kind of normal" and spoke in a regular tone, perhaps a little faster than usual. S.G. told her boyfriend to arrange an Uber ride for Baines in order to "get rid" of him while she tried to figure out what happened, and Baines left. Jane Doe stayed in S.G.'s room, cried a lot, did not really respond to questions about what happened, was unusually affectionate with S.G., said, "You're so pretty. Love you cousin," and " 'Cousin, I love you,' " over and over again, and eventually fell asleep.

That morning, Jane Doe told S.G. that she had been "tussling" with Baines, who "grabbed her some funny kind of way," including by her arm. Her wrist was broken when she fell, perhaps onto a living room bookshelf. She was still in pain and said she needed to see a doctor, so S.G. took her to the hospital.

S.G. recalled another incident at the apartment that occurred at some time before August 14th in which Jane Doe was drunk and argued with

Baines about something. When he tried to calm her down, she threw something, perhaps her flip flops, at him.

S.G. had witnessed Jane Doe say outlandish things when she was drunk. Jane Doe could be dishonest in some situations, and she could become angry and vindictive both when sober and drunk. There were times when she needed to be calmed down due to her intoxication.

### D. *S.G.'s Boyfriend's Trial Testimony*

S.G.'s boyfriend testified that on the night of the incident he was woken up by a knock on S.G.'s bedroom door. Jane Doe came in "acting like real drunk and crazy, like yelling about something . . . ." She was wearing "a night blouse, lingerie, or something like that," and her breasts were "hanging out the side." She was saying something "about her wrist," but mostly talking "gibberish" and was "very upset and drunk." He did not think "the wrist thing" was "serious . . . because it didn't seem like she was hurt." He ordered an Uber for Baines, who seemed relaxed and calm.

The boyfriend recalled seeing Jane Doe and Baines at the apartment complex's pool in the early evening that day. He saw them later hanging out in the apartment's living room and Jane Doe drinking. She was "obviously drunk," by which he meant "stumbling around," constantly holding a drink, and "talking and acting crazy."

Sometime after the incident, when Baines was in jail and Jane Doe was known to in fact have been seriously injured, Jane Doe told the boyfriend that Baines was in jail and was going to stay there. He had seen Jane Doe say things that indicated "a vindictive nature."

### E. *B.F.'s Trial Testimony*

The apartment mate, B.F.,[2] testified that she had known Jane Doe for a number of years. When Jane Doe stayed at the apartment in 2019, she was on occasion intoxicated, meaning that "[s]he would be very drunk." In that state, she would be "extremely emotional, . . . slurring her words, kind of falling over. . . . [A]nd then her moods would like rapidly switch from being very giddy to being very sad or angry." At times, she was incoherent.

On the day of the incident, B.F. picked up Baines at the BART station and brought him back to the apartment. That evening, she was in her room when she heard banging for a couple of minutes and a female voice yelling something. At some point, S.G. called B.F., who went to the living room, where Jane Doe was getting up from the floor. Jane Doe kind of slurred her words and was a little bit incoherent and quite emotional; B.F. could tell she had been drinking. She said Baines had "grabbed her and turned her, and then she felt her arm snap."

### F. *Margaret S.'s Trial Testimony*

A retired social worker, Margaret S., testified that she was working at a local hospital when Jane Doe came there in August 2019. She spoke with Jane Doe and, when the prosecutor asked what Jane Doe said, the defense objected on hearsay grounds. The prosecutor argued what Jane Doe said was admissible as a prior consistent statement and the court agreed because the defense "has tried to say she is making it up or that she did it herself, so okay, I'll allow it."

Margaret S. then testified that Jane Doe said she came to the hospital because she was having a lot of pain in one arm that her ex-boyfriend had

---

[2] We will rely on first names or initials when discussing some witnesses in order to protect their privacy, and mean no disrespect by doing so.

9

hurt, "ex" because "they had been in a relationship and she had been, especially that night, trying to break it off." From what Margaret S. could remember, Jane Doe said "they both had been kind of drinking, but arguing, and she had been trying to get him to leave. And . . . he wanted to continue to stay and have sex, and she kept telling him no, and eventually he tried to force it." At some point, he "put her arm behind her and had her . . . by the back of her head, and her hair, and that's how the injury happened."

When her memory failed her, Margaret S. was given some of her notes from her conversation with Jane Doe to review. They indicated Jane Doe told her she resisted her ex-boyfriend's attack and tried to block him from taking her phone. She also said she had had four or five shots of alcohol within an hour on the night of the incident.

Margaret S. told Jane Doe she, Margaret S., had to call the police as a mandated reporter, and offered Jane Doe some domestic violence resources. "But," Margaret S. further testified, "[Jane Doe] said she really didn't want me to call the police or make a report . . . , she just wanted this pain taken care of. She was in a lot of pain. And so I told her, . . . I'm sorry, but I really have to."

### G. *Baines's Trial Testimony*

Baines testified that he was 42 years old at the time of trial, which would have made him about 39 years old at the time of the incident. In August 2019, he had been dating Jane Doe for a few months and had engaged in oral sex and sexual relations with her, including in the living room area of the apartment where she was staying. He witnessed Jane Doe drink a lot of alcohol and thought she had a drinking problem.

On August 14, 2019, Baines visited Jane Doe at her apartment. There, Jane Doe smoked marijuana. They then went to the pool, where they met another couple and Jane Doe drank a lot of alcohol; he did not drink.

10

Jane Doe and Baines returned to the apartment around sundown, where she changed into "lingerie stuff."  She then blocked the doorway to the kitchen, where he had gone, gyrated her hips at him, and tried to lick his face.  She seemed more intoxicated than she was at the pool.  He testified, "I told her I think she should go brush her teeth and brush her tongue, because her tongue was yellow, and she's likely to give me gingivitis with her mouth if I kiss her.  I wasn't trying to be mean. . . . I was saying things like you should shower, you smell like outside, you smell like cigarettes, stuff like that."

Jane Doe then "got an attitude and started cussing [Baines] out."  She walked away and began "drunk talking" while Baines sat on a living room couch, ate, and watched television.  Suddenly, he heard "motherfucker," and was hit on his left side.  He blocked his face from Jane Doe's blows and stood up to get out of the way of them.  He walked towards Jane Doe to avoid being cornered.  Jane Doe was screaming at the top of her lungs, "motherfucker, I don't need you.  I'll get a restraining order, and this and that."  He did not hit her back, punch her, force her head into his crotch, or grab her arms, but he may have pushed her with his leg to get her out of his way.  He was "shocked," "confused," and "scared of the person she was drunk."

Baines, once he got away, avoided Jane Doe.  To protect himself from future accusations, particularly given his previous convictions for rape, pandering, and pimping, he started an audio recording to document what was happening.  On the recording, he testified, Jane Doe could be heard saying, "My arm's broken.  You've messed my arm up," but he did not break her arm.  She also could be heard telling him to leave.[3]

---

[3] The trial court denied the defense request to admit the recording into evidence after the prosecution made a hearsay objection.

11

Baines did not leave the apartment because BART did not run at that time of night—2:00 a.m.—and because he, on parole, had been followed by police as he walked to the apartment complex in the past. He was waiting for BART to open up or to get a ride home from S.G.'s boyfriend. He did not have an Uber account but sometimes others at the apartment had called an Uber for him. Eventually, others at the apartment came and separated the two. Baines left in an Uber ordered by S.G.'s boyfriend.

Baines further testified that he was convicted in 2002 of a violation of Vehicle Code section 10851, and in 2004 of rape in violation of section 261, subdivision (a) and pandering in violation of section 266I, subdivision (a). In August 2019, he was on parole and wore a GPS device as part of that parole.

## H. *The Trial Court's Verdict and Sentence*

In closing argument, the prosecutor contended Baines was "a serial abuser of women" and Jane Doe his latest victim. He argued that Jane Doe was credible and Baines was not. Defense counsel argued the opposite, that Jane Doe lacked credibility and Baines was credible.

The trial court found Baines guilty of the two counts charged, found true the enhancement accompanying the domestic violence charge, and did not find true the great bodily injury enhancement attached to the sexual assault count. It also found true the allegation that Baines had suffered a prior strike conviction for rape. The court further found the People had shown by a preponderance of the evidence (which we have not summarized here, as neither its admission nor the court's finding is contested on appeal) that Baines committed a prior act of domestic violence in 2018 and another in 2021. It also took into consideration Jane Doe's testimony that Baines had previously choked her as another domestic violence incident.

The court explained that it found Jane Doe to be "very credible" and Baines to lack credibility for numerous reasons. These included that Jane

12

Doe had doubtlessly suffered a significant injury; that she told everyone in the apartment immediately after the incident that she thought her arm was broken; that she told the hospital social worker, Margaret S., and the officer at the hospital that Baines had tried to force her into a sexual act; that there was a lack of evidence she was dishonest about the events surrounding the incident; and that she gave a "remarkably consistent" recounting of what occurred for three and a half years. The trial court also said it had viewed the body cam video and, as we will discuss, considered its contents.

As for Baines, the court explained, his account would have the court believe the X-ray of Jane Doe's arm was a lie because she was never injured, since he had not hit or restrained her and she had never fallen. The court found offensive the argument that Jane Doe had changed into lingerie consistent with someone wanting to have sex, which was "akin to saying that a woman deserves to be raped because of what she's wearing."

The trial court subsequently sentenced Baines to a total of eight years four months in state prison.

Baines filed a timely notice of appeal.

## II. DISCUSSION

### A. *Baines's Due Process and IAC Claims*

First, Baines argues the trial court violated his state and federal constitutional due process rights by considering the untranscribed portion of the body cam video, focusing on where the police officer coaxed a reluctant Jane Doe into talking with the domestic violence resources provider, because this portion was not actually admitted into evidence. The People argue that Baines has forfeited this argument by his failure to object below to the trial court's consideration of this portion of the body cam video on constitutional due process grounds. We agree with the People. We also reject Baines's alternative argument that his trial counsel's failure to object was ineffective

assistance of counsel, particularly because counsel's silence did not prejudice Baines's case.

## 1. The Proceedings Below

As we have recounted, the prosecutor asked the trial court to admit the body cam video and a transcript of the interview, which turned out to transcribe only a portion of the video, during the testimony of the police officer who interviewed Jane Doe at the hospital the evening after the incident.  Defense counsel objected to the evidence as hearsay.  The prosecutor argued, "To the extent that it includes prior consistent statements, I move not to publish it at this time.  But, if the court feels the need to review it at some point, I'll defer to the Court with input from the defense of course . . . ."  The court then ruled, "I'm going to admit it to the extent they are prior consistent statements, because . . . the defense's theory is that she's lying and she made it up.  So, I'm going to allow it as prior consistent statements."

Defense counsel than asked "for clarity on what is the prior consistent statements the prosecution is getting this in for.  I don't think they can just get in an entire body cam and say, well, this is consistent, without pointing out to specific things, which is what they are doing."  The prosecutor replied, "You know, so descriptions of what led up to the altercation, descriptions of the altercation, um, again, you know, we can go through it line by line, but I—I think the Court is capable of parsing that out.  If the defense is not, um, content with that, I'm happy to discuss it maybe after we are done with testimony, in a more detail fashion."  The court said, "Okay," and defense counsel said, "All right."  The parties do not indicate that they and the court further discussed the subject.

In closing argument, Baines's counsel, in challenging Jane Doe's credibility, noted that she testified on direct examination that she did not

14

resist the police being called at the hospital, which Margaret S.'s testimony indicated was not true. "But," counsel continued, "we also know that once (Jane Doe) is informed of domestic violence resources, she turns to be okay with it."

The trial court, in addition to the explanations of its verdict that we have summarized, stated that it was "clear to anyone who watches that, that (Jane Doe) in no way wanted to get Mr. Baines in trouble. She did not want it reported to the police. That's evident on the body cam; it's evident from the testimony of the social worker, she did not want to have the police involved."

The court also said, "[Defense counsel] argued that . . . (Jane Doe) is making this up, she wants to get him in trouble, she was all happy to get these domestic violence resources at the hospital. Again, going back to the body cam [video], no, she didn't want those domestic violence resources. She was very reluctant. [The police officer] kept pushing this on her and telling her that it was his . . . obligation to give her these resources. [¶] He called STAND for her on his iPhone, gave it to her. She didn't really want to talk to STAND. . . . [She] wanted to get out of there. She was saying, oh, I'll contact these people later. She didn't—her main concern was getting treatment for her broken arm. She was not concerned about getting Mr. Baines in trouble or pursuing . . . domestic violence resources."

The court added, "[Jane Doe] is absolutely not out to get Mr. Baines. She would never have been in the hospital but for the pain and the broken arm. She would never have reported to the police, but for the hospital being mandated reporters. [¶] Her main thing was Mr. Baines broke her arm, and she wanted to get treatment for it."

15

Defense counsel made no objection to the court's analysis, including its consideration of the untranscribed portion of the body cam video regarding domestic violence resources.

### 2. Analysis

a. *Baines Has Forfeited His Constitutional Due Process Claim*

Generally, " ' " 'a constitutional right,' or a right of any other sort, 'may be forfeited in criminal . . . cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " ' [Citation.] 'Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal.' [Citation.] ' "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" ' [Citation.] Additionally, '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' " (*People v. McCullough* (2013) 56 Cal.4th 589, 593.)

Our Supreme Court has further explained, " ' " ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " ' " (*People v. Simon* (2001) 25 Cal.4th 1082, 1103.)

Baines's trial counsel objected to the body cam video on one ground, hearsay, and made no objection to the trial court's discussion of the video in announcing its verdict. Further, the record is unclear as to whether the trial court admitted the entire body cam video into evidence or just the portion Baines claims was admitted—essentially, the transcribed portion; the hazy

16

procedure the prosecution suggested the court employ in reviewing the video was discussed *after* the court ruled, and it is not clear the court agreed to be limited to that procedure.

Also, *Baines's* counsel referred in closing argument to Jane Doe being "okay" with domestic violence resources—which was only seen in the portion of the video Baines now claims the trial court should not have considered. The trial court, in explaining its verdict, subsequently responded to that reference by stating that the body cam video indicated Jane Doe was reluctant to speak to the domestic violence resources provider.

These events demonstrate that this case cries out for the application of the forfeiture rule to Baines's constitutional due process claim. If Baines's counsel had objected below, the trial court could have easily clarified its evidentiary ruling and the reasons for its verdict.

Baines argues the prosecutor's failure to introduce a full transcript of the entire body cam video violated California Rules of Court, rule 2.1040 and made clear he did not offer the entire video into evidence; that forfeiture does not apply because the prosecution's failure to call out its limited transcript of the body cam video led to Baines's counsel's failure to object and therefore excused that failure; and that in any event, we should exercise our discretion to consider his claim, which he argues affects his substantial rights, even if it is subject to the forfeiture rule.

Baines's arguments are unpersuasive. First, as we have already discussed, it is unclear whether the trial court admitted the entire body cam video and in any event, Baines's trial counsel did not at any time below make an objection based on the California Rules of Court either; nor does he establish on appeal that a violation of the California Rules of Court automatically prohibits admission of the proffered evidence.

17

Second, Baines's constitutional due process claim is based on the court's later statements in explanation of its verdict, which first indicated it had considered the last part of the body cam video. Baines's trial counsel made no objection to the court's verdict statements, a classic ground for forfeiture. And as for Baines's assertion that we should exercise our discretion, we decline to consider this muddled circumstance for the first time on appeal because, based on this record, doing so would be a particularly inefficient and unfair process.

b. *Baines Did Not Receive Ineffective Assistance of Counsel*

To establish an ineffective assistance of counsel violation, a defendant first "must show that counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) "[O]n direct appeal we must reject the claim of ineffective assistance of counsel, 'unless there simply could be no satisfactory explanation'" for trial counsel's actions. (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) Further, the defendant is only entitled to a remedy if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.)

Here, there *is* a possible explanation for Baines's trial counsel's lack of objection to the trial court's verdict statements indicating it had considered the entire body cam video, namely the fact that Baines's trial counsel had referred in closing argument to Jane Doe's willingness to talk with the domestic violence resources provider in discussing inconsistencies in her statements over time. Baines does not challenge his trial counsel's reference as part of his ineffective assistance of counsel claim. It readily explains counsel's lack of objection when the trial court responded to it in explaining

18

the reasons for its verdict—he had opened the door to the court's consideration of it by his own argument.

Second, there is no reasonable probability that, but for counsel's silence, the result of Baines's trial would have been different. The trial court found Baines's account of the incident to lack credibility in significant part because of a reason that had nothing to do with its consideration of the purportedly unadmitted portion of the body cam video. That is, Baines had no explanation whatsoever to explain how Jane Doe's arm was broken.

Conversely, the trial court found Jane Doe to be credible in significant part for two reasons that also had nothing to do with the court's consideration of the untranscribed portion of the body cam video: her immediate complaint to others in the apartment about the pain in her arm and her statements to Margaret S. and the police officer at the hospital that Baines had tried to force her into a sexual act. The court also correctly noted that Jane Doe had been consistent in her account for over three years. The purported inconsistencies emphasized by Baines's trial counsel did nothing to effectively challenge these aspects of Jane Doe's account or the undisputed evidence of her serious injury. Add to all of this the court's unchallenged finding that Baines had committed other acts of domestic violence in 2018 and 2021 and it is apparent that the prosecution had the much better case here.

But perhaps most important, the portion of the body cam video showing Jane Doe's reluctance to talk to a domestic violence resources provider was itself evidence of a minor and redundant nature. Whether or not she wanted to engage with domestic violence resources did nothing to undermine the undisputed testimony of Margaret S., a mandatory reporter (which, as we will discuss in the next section was admissible as a prior consistent statement), that Jane Doe asked her not to tell the police about the incident

19

and the evidence that Jane Doe talked to the police only after Margaret S. reported the incident to them. This evidence was far more important to the court's analysis of Baines's guilt than Jane Doe's reluctance to talk to a domestic violence resources provider. Indeed, we question whether the court would have even referred to the last part of the body cam video if Baines's counsel had not first referred to it in closing argument.

For each and all these reasons, Baines's ineffective assistance of counsel argument lacks merit.

## B. *The Court Did Not Abuse Its Discretion in Admitting the Body Cam Video Evidence and Testimony of Margaret S.*

Baines next argues the trial court committed prejudicial error by admitting the body cam video and the accompanying transcript (collectively, the body cam video evidence) and Margaret S.'s description of what Jane Doe told her about the incident because this evidence did not contain prior consistent statements as defined by Evidence Code section 791 and, therefore, contained inadmissible hearsay. We disagree.

As we have discussed, the prosecutor's questioning of Margaret S. about what Jane Doe told her and the prosecutor's request that the trial court admit the body cam video evidence were both met by Baines's trial counsel's hearsay objection—which his counsel did not otherwise explain—and the court's decision to admit the evidence as prior consistent statements because the defense theory was that Jane Doe was lying and making up her account of the incident.

### 1. Legal Standards

Hearsay evidence "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as

provided by law, hearsay evidence is inadmissible."  (Evid. Code, § 1200, subd. (b).)

Evidence Code section 791 provides such an exception.  It states, "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:

"(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or

"(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Evidence Code section 1236 states, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

Our Supreme Court has explained, "A prior consistent statement is admissible as an exception to the hearsay rule if it is offered after admission into evidence of an inconsistent statement used to attack the witness's credibility and the consistent statement was made before the inconsistent statement, or when there is an express or implied charge that the witness's testimony was recently fabricated or influenced by bias or improper motive, and the statement was made before the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.)"  (*People v. Kennedy* (2005) 36 Cal.4th 595, 614 (*Kennedy*), disapproved on another ground in *People v. Williams* (2010)

49 Cal.4th 405, 459.)  Crucially here, "Evidence Code section 791 permits the admission of a prior consistent statement when there is a charge that the testimony given is fabricated or biased, not just when a particular statement at trial is challenged."  (*Kennedy*, at p. 614.)

We review a trial court's evidentiary ruling "to determine whether the court ' "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice." ' "  (*People v. Shultz* (2020) 10 Cal.5th 623, 668; *Kourounian v. California Dept. of Tax & Fee Administration* (2023) 91 Cal.App.5th 1100, 1112 ["A trial court's evidentiary rulings, including those involving the hearsay nature of evidence, are reviewed for abuse of discretion."].)

## 2. Analysis

The trial court did not admit the body cam video evidence and Margaret S.'s testimony until after Baines's trial counsel repeatedly questioned Jane Doe on cross-examination about previous statements she had made that were purportedly inconsistent with her trial testimony, including statements to the police officer at the hospital and at the preliminary hearing in the case.  He also queried her on what she was told by the social worker at the hospital.  Baines now argues that his trial counsel never implied that Jane Doe fabricated the core elements of her claim—the forced oral sex attempt and the ensuing battery—after her hospital interviews.  We disagree.

Baines himself admits on appeal that his trial counsel "arguably implied during Doe's cross-examination, by confronting her with prior inconsistent statements from her hospital interviews as to certain details of her claims, that those details were fabricated as a result of some additional motive arising after the hospital interviews and before trial—possibly, a motive to adjust those details after realizing their incredibility."  He notes,

22

for example, inconsistencies pointed out on cross-examination regarding whether she was lying down or sitting on the couch, how many hands Baines used to force Jane Doe's head down, and how long their fight lasted.

Baines also argues his trial counsel's attack was on just those details raised in the cross-examination. He contends that the "defense theory . . . was that Doe fabricated her claim's core elements earlier than the August 15 hospital interviews, after becoming angry at Baines on the night of August 14 for rejecting and insulting her. The hospital hearsay was accordingly *after* the 'motive for fabrication . . . [was] alleged to have arisen,' not 'before' as [Evidence Code section 791] requires."

Baines further argues that a significant portion of the challenged evidence was regarding how willing Doe was to report Baines to the police at the hospital, which he claims counsel never implied was any different than her trial testimony.

These arguments are unpersuasive for two reasons. First, Baines does not identify anywhere in the record where the defense theory he now urges was articulated to the trial court before or during its consideration of the prosecution's request that the challenged evidence be admitted as prior consistent statements; Baines cites only to portions of the record that came *after* the court's ruling. It is axiomatic that we evaluate a trial court's evidentiary ruling by looking at what was before the trial court at the time it made its ruling. (See, e.g., *People v. Hartsch* (2010) 49 Cal.4th 472, 491 [noting, in reviewing a trial court's evidentiary ruling, "Our review, of course, is limited to the evidence before the court when it heard the motion."].) And indeed, Baines's counsel, while raising a generic hearsay objection, offered no explanation why any of the challenged evidence was not admissible as prior inconsistent statements. We see no reason under these circumstances why

the trial court should have foreseen the defense theory or its implications to the admissibility of the challenged evidence at the time the court admitted that evidence.

Second, the trial court was aware at the time it made its ruling of the all-encompassing nature of Baines's trial counsel's cross-examination of Jane Doe. For example, Baines's counsel asked, sometimes accompanying his questions by playing portions of the body cam video, about Jane Doe initially telling the police officer at the hospital that Baines had not previously tried to choke her; if she told the officer Baines was sitting in the back seat when he tried to choke her, not the passenger seat as she testified; if she would agree that once the police were called by the hospital social worker, she felt like she had to talk to them and that, as counsel put it, when she was "speaking to the social worker, you were also informed of possible benefits of calling the police as well, correct?"; about the fact that she never told the police or testified at the preliminary hearing in the case that she did not want to be alone with Baines and had taken a break from him; after quizzing her about her intoxication and soliciting a response indicating that she was not "highly drunk" that night, about her telling the police officer that she wasn't actually drunk that night; about her testimony at the preliminary hearing that she drank four or five shots *before* going to the pool; and about her testimony at the preliminary hearing that she only had two mixed drinks that night. Defense counsel concluded this long series of queries with the question, "Now, [Jane Doe], you've been dishonest before, correct?"

Defense counsel then asked about other purported inconsistencies. These included about Jane Doe's preliminary hearing testimony that she made food the night of the incident, contrary to her trial testimony that she did not cook; that she did not tell the police that Baines put her hand in his

24

lap or that his penis was out; about whether she told the police officer and testified at the preliminary hearing that Baines punched her once, not repeatedly as she testified at trial; and that she testified at the preliminary hearing that her arm hurt because of a punch to it, not from pulling away from Baines as she told the police officer.

Counsel's extended cross-examination over numerous aspects of Jane Doe's story makes clear that the purpose of this cross-examination was to attack her overall credibility and contend that she was fabricating her story, including by improving upon it over time. Under these circumstances, *Kennedy* instructs that under Evidence Code sections 791 and 1236, the prosecutor should be allowed to introduce evidence of prior consistent statements so as to have a fair opportunity to counter such an all-encompassing attack. Moreover, Baines's trial counsel did not insist on a line-by-line review of the body cam video, thereby implicitly conceding the trial court would exercise broad discretion in its review of the video. For these reasons, Baines fails to show the trial court abused its discretion in admitting Jane Doe's entire account of the incident as seen on the body cam video.

Further, to the extent it can be argued that the latter part of the body cam video showing Jane Doe's reluctance to talk with the domestic violence resources provider was not a prior consistent statement, we conclude, as we have discussed above regarding Baines's ineffective assistance of counsel claim, that it was not reasonably probable that the court's consideration of it prejudiced Baines's cause (*People v. Jasso* (2025) 17 Cal.5th 646, 679 [erroneous admission of hearsay evidence evaluated under " 'the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the

error' "]), as the evidence was of a redundant nature and not a major part of the trial court's analysis.

In short, Baines's hearsay claim lacks merit. In light of our conclusion, we have no reason to consider the parties' debate over the reliability of the hearsay evidence or whether any trial court error in admitting the challenged evidence prejudiced Baines's case.

Also, given our conclusions herein, we need not address Baines's claim that the court's errors, both individually in combination, denied him a fair trial.

## III. DISPOSITION

The judgment is affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.